Kimberly Sherman, OSB 174646
Education, Environmental, & Estate Law Group LLC
P.O. Box 728
Eugene, Oregon, 97440
Tel: (503) 910-6172
kim.sherman@e3lawgroup.com

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**EUGENE DIVISION**

| | |
|---|---|
| **J.S., by and through their next friends S.S. and E.S.,**<br><br>Plaintiff-Appellant,<br><br>v.<br><br>**EUGENE SCHOOL DISTRICT 4J**<br><br>Defendant-Appellee. | **Case No.:** 6:21-cv-1430<br><br>**COMPLAINT**<br><br>(Appeal of Hearing Officer's Decision Pursuant to Individuals with Disabilities Education Act ("IDEA") and Section 504 of the Rehabilitation Act) |

**I.     CLAIM FOR RELIEF**

**(Appeal Of Hearing Officer's Decision Pursuant to IDEA, §504 of the Rehabilitation Act, and the Americans with Disabilities Act; and State Law Claims Pursuant to Oregon Revised Statutes ("ORS") 343.161; Oregon Administrative Rules ("OAR") 581-015-2000 et seq., OAR 581-015-2390 through 581-015- 2395; and OAR 581-022-1620.)**

**II.     NATURE OF ACTION**

1.      This is an appeal of an administrative law judge's ("ALJ") decision issued pursuant to the Individuals with Disabilities Education Act ("IDEA") (20 U.S.C. § 1400 et seq. ("IDEA") and 34 C.F.R. 300 et seq.); Section 504 of the Rehabilitation Act of 1973 ("§ 504"),

1 - Complaint

(29 U.S.C. §§ 701 et seq. and 34 C.F.R. Part 104 et seq.); discrimination under Title II of the Americans with Disabilities Act ("ADA") (42 U.S.C. § 12101 to 12213 and 28 C.F.R. Part 35 (2010)); the ADA Amendments Act (ADAAA) (Public Law 110-325, ADAAA, 42 U.S.C. § 12101 et seq. (2008)); the Constitution and laws of the United States; and relevant Oregon state statutes and rules, including ORS 343.161; OAR 581-015-2000 et seq., OAR 581-015-2390 through 581-015- 2395; and OAR 581-022-1620.

2. This appeal is brought by student J.S., by and through their[1] next friends, S.S. and E.S., ("Student") by their counsel Kimberly Sherman against Defendant Eugene School District 4J ("Defendant") in an appeal of the underlying due process hearing decision in *In The Matter Of The Education of Student and Eugene School District 4J*, OAH Case No. 2020-ABC-04021 ("Final Order") (attached as Exhibit 1).

### III. JURISDICTION AND VENUE

3. The underlying action, filed in the Oregon Office of Administrative Services through the Oregon Department of Education and with Defendant School District, reached a final order and mailed those findings to parties on July 1, 2021. Parties may file an appeal of the Final Order in the Federal District Court, District of Oregon within 90 days after the mailing date of the Order. Final Order at 90. 20 U.S.C. § 1415(i)(2)(A). This action was filed within the permitted time period.

4. Plaintiff has exhausted their administrative remedies to the extent required under the IDEA, § 504, and the ADA.

5. This court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1343(a) because this civil action arises under the IDEA; ADA; Section 504 of the

---

[1] To protect Student's identity, non-gendered pronouns are used throughout.

2 - Complaint

Rehabilitation Act of 1973; and the Constitution and laws of the United States. This court has jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. §§2201 and 2202. Pursuant to 28 U.S.C. § 1367, this court has jurisdiction over the state law claims related to the same issues and controversies that gave rise to federal law claims.

6. The Plaintiff has standing to be before this court. At all times during the events detailed below, Plaintiff and their parents were residents of Eugene, Lane County, Oregon. The injuries described below are concrete and particularized actual injuries-in-fact. The injuries-in-fact were caused by the defendant's actions or refusals to act in a manner required by federal and/or state law. The relief requested is within the court's power to provide. Plaintiff is a person with a disability as defined in the IDEA, ADA, and § 504.

7. Defendant school district is located within this court's jurisdiction and transacts business in this jurisdiction, and a substantial portion of the acts giving rise to this action occurred in this jurisdiction. Defendant's principal place of business is Lane County. Thus, venue is properly vested in this court pursuant to 28 U.S.C. § 1391(b).

## IV.  PARTIES

8. Student is currently a seventh-grade student served by Defendant Eugene School District 4J. Parents and Student reside within the Defendant school district attendance boundaries. Student continues to be a person with disabilities eligible for special education services under the IDEA, Section 504 of the Rehabilitation Act, and the Americans with Disabilities Act.

9. At all times detailed within, Defendant was and is a duly recognized public agency in Eugene Oregon that operates a public school district under the laws of the State of Oregon.

## V.     FACTUAL ALLEGATIONS

10.     Background facts relating to Student and their school experiences are provided in detail in Student's amended complaint. Key facts are summarized here.

11.     Student was born on June 16, 2008. Student experiences the effects of Fetal Alcohol Syndrome and Reactive Attachment Disorder due to exposure to alcohol and other toxic substances while in utero and infancy. Student lived with biological mother from birth to age three. Student was then removed from their biological mother's care and placed with their father and stepmother. Father and stepmother obtained sole custody of Student on October 19, 2011. Student was subsequently adopted by their stepmother.

12.     On April 6, 2012, Student was found eligible to participate in Early Childhood Special Education ("ECSE") under the category of Developmental Delay. Student was diagnosed with Fetal Alcohol Syndrome and developmental delays in May 2012. In November 2013, Student was diagnosed with Attention Deficit Hyperactivity Disorder.

13.     In July 2013, Student and Family relocated to Eugene, Oregon. At all times relevant to this hearing, Student lived in the Eugene 4J school district and was eligible for special education and related services under the IDEA under the category of Emotional Disturbance. Student previously was found eligible under Communication Disorder and Other Health Impairment.

14.     Prior to the events covered by the two-year lookback allowed under the IDEA *Avila v. Spokane Sch. Dist. 81,* 852  and beginning with Student's first educational experiences in kindergarten, Student experienced significant behavior challenges while in the classroom, frequently resulting in their throwing items, lashing out at adults and other students, and refusing requests. Student's behavior often resulted in room clears and could last 45 minutes or more.

4 - Complaint

Similar behavioral outbursts also occurred at Student's after-school day care. Parents noted that Student exhibited the behaviors of concern as soon as they entered school but they did not exhibit them at Student's home, where they were generally calm though distractible and impulsive.

15. After first grade classes began in the Fall of 2016, Student's behavioral challenges escalated, interfering with their learning. In November, Parents sought from the District a review of Student's IEP and re-evaluation. In approximately early February 2016, District placed Student in its "Home Instruction" program on a reduced school day. District agreed to reimburse Parents for the cost of childcare during school hours except for the period that Student received academic tutoring.

16. The Home Instruction program provided two hours per day of academic tutoring at a campus located in West Eugene. District paid $7,827.50 to parents to reimburse for day care supervision of Student during school-day hours beyond the tutoring time provided by Home Instruction.

17. Mr. Justin Potts coordinated a psychoeducational assessment of Student beginning in December 2015 and concluding on April 11, 2016. Mr. Potts observed Student three times in their school program at Corridor Elementary School, prior to beginning home-instruction. Mr. Potts did not record any observations of Student in Student's day care setting. The psychoeducational assessment included a speech language assessment and an occupational therapy evaluation. The speech language assessments were conducted on January 12 and 26, 2016 and February 12, 2016. The speech-language professional did not indicate the setting of the assessments. The occupational therapy evaluation was conducted on January 14, 2016; the therapist did not specify the location of the evaluations and therapies, but it is inferred that these

took place at the therapist's offices at Connect the Dots Pediatric Therapy in Eugene Oregon, because Student's uncle and father accompanied Student to one or more of the sessions.

18.  Parents requested the District seek to place the Student in a therapeutic day program that addressed both their behavioral challenges and educational needs. The District sometimes placed students at local therapeutic day programs, but upon learning their preferred programs, including The Child Center, were currently full, assisted the Parents on placing Student on a waitlist for an opening for the Student, aware that an opening might not occur until the following school year. District continued to reimburse Parents for Day Care during school hours during times Student was not engaged in Home-Instruction, even after Student's psychoeducational assessment had been completed.

19.  While Student was placed on Home Instruction, the District entered an agreement with the Lane Educational School District (LESD) to establish and jointly manage a public school program similar to the private therapeutic day programs in which it sometimes placed students. The new program was named the Comprehensive Services Program ("CSP").

20.  In late July 2016 the District and or ESD contacted Parents regarding the Student's planned placement at The Child Center, and since the Student was still on the waitlist, the District suggested the Parents visit and consider the newly developed CSP as an alternative to placement at The Child Center, since it offered the Student similar supports and there was an opening for placement at the start of the school year. District especially described that the CSP offered embedded mental health and wrap-around behavioral supports throughout the day. Parents were told the CSP was designed to be similar to The Child Center.

21.  On August 30, 2016, the Student's IEP team amended Student's Special Education Placement Determination. The new document reflected the Student's new placement

in a public separate school, stating, "Specialized program administered by the Lane ESD focusing on instructional level curriculum in small-groups, low student to teacher ratio programming, and embedded mental health supports." The team determined that the location of this placement was the new CSP at District's Fox Hollow campus. This program is referred to in the proceedings below as the Fox Hollow – ESD program.

22. Beginning on or around September 9, 2016, Student began attending the Fox Hollow - ESD program. Student's IEP was amended on August 30, 2016, and a new placement decision was recorded as "Public separate school 50% or more: Specialized program administered by the Lane ESD focusing on instructional level curriculum in small-groups, low student to teacher ratio programming, and embedded mental health supports."

23. That same IEP amendment described how the student's disability affects involvement and progress in the general education curriculum:

> [Student] has had a significant number of behavioral problems when in. large school context, even with individual adult attention. [They] can be reactive and is hypervigilant around peers. Concerns about safety and impulsivity have made instruction in typical school settings difficult to manage. Impairments in executive functions cause [Student] to have problems with learning new information particularly when the complexity of a task (and load on executive functions) are increased. Problems in recognizing subtle affective or neutral emotions in others were also noted. [Student] is sensation seeking and has a high level of need for strong vestibular sensory input.

24. Student's August 30, 2016 IEP amendment included three goals in Social, Emotional, and Behavior skills; one goal in Writing; and one Social/Pragmatic goal. Specially designed instruction was to be provided by the ESD in a self-contained classroom for social communication (60 minutes per month); Behavior/Social skills (300 minutes per week); Written Language (120 minutes per week). Social skills were to be provided by the ESD in a self-contained or resource room for 220 minutes per week. Student was to receive related services of

occupational therapy by the ESD for 60 minutes per month, and transportation to and from school daily. Behavior support consultation was identified as a support for school personnel, delivered by the ESD behavior intervention specialist, 350 minutes per year. Thirteen accommodations were listed, all to be provided by the ESD; among the accommodations was "Behavior Support Plan embedded into program" for 240 minutes per day.

25.     The statement of nonparticipation justification stated that "[Student] requires access to a highly structured environment focusing on therapeutic and behavioral interventions."

26.     Student's April 7, 2017 IEP included four goals in Social, Emotional, and Behavior skills and one goal in Writing. Specially designed instruction was to be provided by the ESD in a self-contained classroom for social communication (60 minutes per month); Behavior/Social skills (300 minutes per week); Written Language (120 minutes per week). Social skills were to be provided by the ESD in a self-contained or resource room for 220 minutes per week. Student was to receive transportation to and from school daily as a related service. Occupational Therapy consultation and Behavior support consultation were identified as supports for school personnel. Occupational Therapy consultation was to be provided by the ESD occupational therapist for 240 minutes per year; behavior support consultation was to be delivered by the ESD behavior intervention specialist, 350 minutes per year. Thirteen accommodations were listed, all to be provided by the ESD; among the accommodations was "Behavior Support Plan embedded into program" for 240 minutes per day.

27.     The statement of nonparticipation justification stated that "[Student] requires access to a highly structured environment focusing on therapeutic and behavioral interventions."

28.     The April 7, 2017 IEP described how Student's disability affected their involvement and progress in the general education curriculum:

> [Student]'s difficulty with executive function skills of emotional control (being able to self-regulate), inhibit (being able to control impulses) as well as shift (being able to be flexible in your thinking and problem solving) as well as [their] low tolerance for frustration makes it difficult for him to maintain positive relationships with peers and adults, to self soothe/calm himself over changes or unexpected occurrences, as well as asking for/getting support and attention from adults and peers in a positive way. [Student] is capable of learning grade level general education curriculum, but requires some additional adult support while learning and acquiring new tasks. Given a self-survey related to Zones of Regulation, [Student] recognizes that [they don't] always find it easy to listen, learn and participate, especially during academic tasks, that [they are] unsure how to get along with a friend, peers and other adults at school and doesn't know how to solve problems when [they have] difficulty at school. That [they] often feels angry, sad, silly or overly energized, or even tired at school and that these feelings get in the way of learning.

29. Student's April 6, 2018 IEP included four goals in Social, Emotional, and Behavior skills and one goal in Writing. Specially designed instruction was to be provided by the ESD in a self-contained classroom for Behavior/Social skills (300 minutes per week) and Written Language (120 minutes per week). Student was to receive transportation to and from school daily as a related service. Occupational Therapy consultation and Behavior support consultation were identified as supports for school personnel. Occupational Therapy consultation was to be provided by the ESD occupational therapist for 240 minutes per year; behavior support consultation was to be delivered by the ESD behavior intervention specialist, 350 minutes per year. Thirteen accommodations were listed, all to be provided by the ESD; among the accommodations was "Behavior Support Plan embedded into program" for 240 minutes per day.

30. The statement of nonparticipation justification stated that "[Student] requires access to a highly structured environment focusing on therapeutic and behavioral interventions." The placement decision stated that Student would be placed in a public separate school 50% or more, and that benefits of this option included "[w]ill receive more intensive individualized instruction. Will receive small group/individualized instruction. Will receive specific behavior

monitoring."

31.     The April 6, 2018 IEP described how Student's disability affected their involvement and progress in the general education curriculum by repeating verbatim the statement from the April 7, 2017 IEP (*see* paragraph 28).

32.     Parents were informed in the August 14, 2018 that Eugene School District 4J would assume sole responsibility for the CSP at the Fox Hollow Program (referred to in the record as the Fox Hollow – 4J program). The Fox Hollow – 4J program removed the components of embedded mental health and behavioral specialist that had been provided in the Fox Hollow – ESD program; District did not issue a prior written notice of special education action describing that the new program had removed these components. Instead, District implemented a behavioral model called "Progressive Discipline." Parents learned from the District's website that "Progressive Discipline" was a method of working with students with behavioral challenges in which "consequences for misbehavior are determined both by the severity of the infraction and a student's previous behavior." Parents were also informed that the district had a "zero tolerance" policy for physical aggression.

33.     Student's behaviors regressed significantly and rapidly under the new behavioral methodology and removal of embedded mental health and behavioral supports. Parents estimate that, within the first two months of school in 2018 (September 10 to November 16, 2018,) Student regressed approximately two years in their ability to manage their emotions, control their behaviors, and communicate their needs appropriately.

34.     In September, after only a few weeks of school in the re-designed Fox Hollow program, Student's private therapist witnessed significant regression and a return of aggressive, self-injurious behaviors. Student's private developmental pediatrician also notated an increase in

Student's verbal aggression.

35.     Student's BSP was not available to Student's 4J teacher at the Fox Hollow – 4J program until on or after October 2, 2018. The 4J "CM Assist" department (presumably the Information Technology ("IT") department) emailed Student's teacher Amanda Joseph to inform her that the BSP would be scanned and attached to the "historical docs in Synergy." Synergy is 4J's electronic dashboard and document storage system for student special education documents.

36.     On October 8, 2018, Student was suspended for one day for hitting the principal on the back.

37.     On October 8, 2018, Parent requested verbally and confirmed by email a request for an IEP meeting "as soon as possible" in which Parent stated "[i]t is clear [Student's] IEP and Behavioral Support Plan have not been reviewed by staff or if they have been are being ignored."

38.     An IEP meeting was scheduled for November 16, 2018. Between October 8 and November 15, Student's behaviors continued to regress and Student became angrier and more anxious. On November 15, 2018, Student was suspended for two days for biting a substitute teacher.

39.     The previously scheduled November 16 IEP review was held, but the focus of the meeting pivoted from Parent's desire to work with District staff to improve Student's IEP, conduct a new Functional Behavioral Assessment, and review the Behavior Support Plan and accommodations to a meeting for an alternate placement that more closely aligned with the programmatic components that had been in place in the Fox Hollow – ESD program – namely, reinstatement of an embedded mental health and behavioral support program in a milieu therapeutic setting.  The District no longer had such a program; Parents turned their attention to obtaining placement in The Child Center. The Child Center was an educational program with

11 - Complaint

embedded mental health and behavior supports in a therapeutic milieu program. Parents had been waiting for placement in The Child Center when the District offered the new Fox Hollow - ESD program two and a half years previously.

40. Parents felt strongly that Student was experiencing extreme trauma from their enrollment in the Fox Hollow – 4J program and that they could not return him to the program. District staff agreed that The Child Center was the appropriate placement for Student.

41. District produced a prior written notice of special education which stated, *inter alia,* that "the team agreed to change [Student]'s placement from special school to home-bound instruction as an interim placement while the family awaits a spot in day treatment."

42. Student's November 16, 2018 IEP amendment recorded service delivery times as 300 minutes per week in Behavioral/social skills and 120 minutes per week in written language, for a total of 420 minutes (7 hours) per week of specially designed instruction. Among many accommodations, this IEP amendment also included alternative PE for 30 minutes per week and 240 minutes per day of "Behavior Support Plan embedded into the program."

43. On November 16, 2018, when Eugene School District staff recommended Home Instruction as an interim placement, District staff did not provide the "Abbreviated School Day Notice and Acknowledgement" form as required by Oregon Revised Statute 343.161(4). Since November 16, 2018, District did not review the shortened school day once per term as required.

44. Student's Home Instruction program consisted of five hours a week of academic instruction with a Home Instruction teacher, Tue & Thu 2:30-4 and Fri 2-4.

45. By January 2019, Student was experiencing depression and guilt, stating that they believed their placement of Home Instruction was a punishment for bad behavior, and that this exile was their fault. Student regressed to the point of inflicting self-injurious behavior after

12 - Complaint

years of having this behavior essentially extinguished. In therapy in December, they were so agitated that they intentionally hit themselves in the face with a metal bowl. Student also began scratching themself, has reported bit themself, hits/slaps themself, and also attempts to choke themself. Student verbalized that they are bad and it's all their fault. This information was shared with the IEP team on or around March 19, 2019.

46. On March 19, 2019, Dr. Karen Apgar, District school psychologist, facilitated a conversation related to District-conducted evaluations of Student. The psycho-educational evaluation report found the following (from Summary and Recommendations):

> [Student] has demonstrated an ability to learn, however this ability is significantly hampered by [their] emotional regulation challenges, especially in a traditional school-based learning environment.
>
> …
>
> As a student who receives in-home instruction, [Student's] ability to engage in interpersonal relationships with peers is limited to community activities in which [they have] been enrolled. Observations of [Student] participating in community activities with similarly-aged peers not [Student] engaging in polite conversation and turn-taking interactions. However, when given unstructured time, [Student] did not actively engage with [their] peers. Parents report that [Student] is socially awkward and shy.
>
> …
>
> Information from [Student's] parents and from [their] Home Instruction teacher indicates that [Student] struggles with anxiety around being separated from [their] parents and is a frequent worrier about a wide variety of topics. Similarly, [they] often appears to engage in obsessive/perfectionistic behaviors, becoming upset at situations that would not upset most people. In addition, [Student] frequently engages in defiant, argumentative, and sometimes aggressive behavior.
>
> …
>
> Ratings indicate that [Student] demonstrates extremely high numbers of depressive behaviors, including frequent sadness, dysregulated mood, and expressing feelings of hopelessness and helplessness.

…

[Student's] parents report that [Student] often felt sick or ill when [they were] attending a school setting. [They] also [have] a history of sleep disturbances . . .

47. On March 19, 2019, Parents participated in an IEP meeting. District agreed to increase the amount of Home Instruction tutoring to two hours a day for three days (six hours per week).

48. Student's progress reports for February 1, 2019 and June 18, 2019 indicate that behavior goals instruction was not provided because there were no peers available. Despite District's line of questioning relating to the stability of a child's progress over time, the two progress reports clearly indicate that Student did not progress in behavioral goals while in home instruction, primarily because the behavior goals target behaviors in specific environments (noisy, classroom, with peers) and the home-instruction environment was not noisy, was not a classroom, and had no peers.

49. At hearing, both parents, Student's PSW, and Student's private therapist all testified to the behavioral, social, emotional, and self-esteem regression Student experienced from September 2018 through June 2019. Parents and Student's private therapist noted that Student began self-harming behaviors during that time; Student had extinguished self-harming behaviors during their enrollment at the Fox Hollow – ESD program.

50. On July 25, 2019, Student began educational and mental health programming at The Child Center, a full seven months after District placed Student on a shortened school day while awaiting an opening at a day treatment program such as The Child Center. A focus of The Child Center was overcoming Student's traumatic school experience.

## VI.   APPEAL OF CONCLUSIONS OF LAW, FINDINGS OF FACT, MIXED ERRORS OF FACT AND LAW, AND ERRORS OF THE COURT

51. A due process hearing was held April 12 through 16, 2021. A final order was entered and mailed by the ALJ on July 1, 2021. A copy of said order is attached as Exhibit 1.

52. Pursuant to 20 U.S.C. § 1415(i)(2) and (3)(A) and ORS 343.175(4), the District timely appeals portions of the final order referenced in paragraph 50 and attached as Exhibit 1 in the following particulars and asks the court to reverse the following conclusions of law and/or orders.

53. Student disagrees with the ALJ's characterization of facts, specific conclusions of law, and/or order.

54. Student disputes certain of ALJ Messecar's Findings of Facts as being either not supported by facts, unsupported by the evidence presented at hearing, beyond the scope of issues properly raised at hearing, and/or incomplete. Disputed Findings of Fact include 3, 4, 5, 6, 7, 8, 10. 11, 12, 13, 16, 18, 23, 24, 29, 31, 36, 38, 40, 45, 46, 48, 50, 53, 55, 56, 58, 59, 71, 72, 76, 79, 88, 92, and 94.

55. Student disputes certain of ALJ Messecar's Conclusions of Law, including 1(a), 1(b), 1(c), 1(d), 1(e), 1(f), 1(g), 1(j), and 2.

56. In addition, Student raises the following new procedural claims based upon testimony presented at hearing:

   a. District failed to provide parents with a Prior Written Notice of special education change when the placement was changed in September 2018 and the components of embedded mental health and behavior services were removed from Student's special education placement.

   b. District failed to amend the IEP between September 2018 and April 2019 so that the

15 - Complaint

service summary page reflected the change from the ESD as the service provider to 4J as the service provider.

57. Student disputes ALJ Messecar's order issued from the bench that Parents must pay one-fourth of the cost of hearing transcriptions.

58. Student disputes ALJ Messecar's order that Parents did not prevail on any claim and were thus not entitled to any requested remedies.

59. Student contends:

a. That in Spring and Summer of 2016, District convinced Parents that the newly developed Fox Hollow ESD program was modeled after The Child Center's program and included embedded mental health and wraparound behavioral supports in a milieu therapy setting, as did The Child Center. Student had been on a wait list for placement at The Child Center since DATE 2016. Parents chose to place Student in the new Fox Hollow ESD program rather than maintain their position on The Child Center's waitlist;

b. That Student progressed significantly in key behavioral and social goals while enrolled in the Fox Hollow ESD program during school years 2016-2017 and 2017-2018;

c. That Student's school and WRAP team began discussing that Student might begin transitioning to a less restrictive educational setting and placement during their fourth-grade year (2018-2019 SY);

d. That Student's Special Education and WRAP team, parents, Personal Service Worker, and their long-term mental health therapist (Ms. Snyder) recognized Student's progress in emotional regulation and social skills. Student's father is a

psychologist. Student's Personal Service Worker is their grandfather; Grandfather has many years of professional experience working with people with behavioral disorders;

e. That the Fox Hollow 4J program did not include embedded mental health and wraparound behavioral supports in a milieu therapy setting and did not specify that change in components in a PWN;

f. That Student's behavioral, emotional, and social skills regressed significantly in the first two-and-one-half months of the 2018-2019 school year under the Fox Hollow 4J program;

g. That suspension from school is a punishment, especially if the suspended Student views suspension is a punishment;

h. That Fox Hollow 4J program staff did not have Student's Behavior Support Plan until sometime after October 8, 2018 and were thus not able to implement Student's Behavior Support Plan prior to that date;

i. That District provided no evidence beyond conclusory testimony by staff that staff implemented Student's IEP or Behavior Support Plan consistently despite multiple requests for those data or evidence by Parents as early as DATE and despite evidence presented at hearing that staff requested on October 2, 2018 that the District's IT department locate and upload Student's BSP into the district's electronic document dashboard because staff at Fox Hollow-4J did not have the BSP;

j. That District provided no documentary evidence beyond conclusory testimony by staff that embedded behavioral supports were available to Student when Student's

17 - Complaint

behaviors escalated, including during the two events that caused staff to suspend Student;

k. That a Student's special education placement is neither a location nor the title of a district's program; "placement" is a setting that contains specific programmatic components. Student contends that the removal of mental health supports and wraparound behavioral supports in a milieu therapy setting when the District created its Fox Hollow 4J "progressive discipline" program represented a change in placement for Student;

l. That the District did not offer a FAPE to Student during the 2018-2019 school year;

m. That District was responsible for placing student in a placement that provided the same components of embedded mental health and behavioral services in a milieu therapy setting when (1) the District took over the Fox Hollow program from the ESD; and (2) when the IEP team determined in November 2018 that the components of The Child Center were the appropriate placement for Student;

n. That the District did not provide an appropriate placement for the Student during the 2018-2019 school year, even though the District had created the appropriate placement in the Spring and Summer of 2016 for Student and other students similarly situated;

o. That Student's placement in Home-Instruction violated the IDEA's requirement that a student with disabilities be instructed in the least restrictive environment and whose IEP "is reasonably calculated to enable the child to make progress in light of their circumstances." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1,* 137 S. Ct. 988, 1002,

(2017);

p. That Student's placement in Home-Instruction violated Section 504 of the Rehabilitation Act and the Americans with Disabilities Act requirements that a student with disabilities be instructed in the most integrated setting appropriate to the individual's needs. 34 C.F.R. § 104.4(b)(2);

q. That District failed to consider any other instructional, social, or behavioral programming alternatives in place of or in addition to five- and then six- hours of home-instruction;

r. That the District is not absolved of its duty to provide an appropriate continuum of placement options (including a program with the mental health and wraparound behavioral services <u>components</u> of a program placement) when the District (1) disbanded a previously successful program with those components, (2) failed to create a similar program with similar components; and (3) relied on a private program that offered the same appropriate programmatic components as its only option in the continuum of placements available to Student;

s. That District's reliance on Home-Instruction as an interim placement violated the IDEA and Section 504 when Student was placed on Home-Instruction specifically as a wait-list placement for seven months until The Child Center had an opening; and that a seven-month waitlist was not "temporary" and was impermissibly long, and denied Student a FAPE under both IDEA and Section 504;

t. That District's placement at The Child Center violated the IDEA and Section 504's requirement that special education and related services be provided at no cost to the

Parents when Parents were required to pay out of pocket for the therapist of their choice because The Child Center <u>required</u> that Parents permit The Child Center to bill Parent's insurance for The Child Center therapists;

u. That Parents who request a due process hearing under the IDEA and Section 504 should not be required to pay a portion of the due process hearing transcription costs; and

v. That Student is entitled to relief as requested in Student's Amended Complaint.

WHEREFORE, Student prays for judgment as follows:

1. On its claim for relief, that the July 1, 2021 findings of fact and conclusions of law of the ALJ's Final Order referenced above in paragraph 50 should be reversed;

2. That the Order of the ALJ finding that Parents failed to show the District violated its obligation to provide Student with a FAPE or violated Section 504; and

3. For such other relief as the court deems just and proper.

Respectfully submitted this 28th day of September, 2021

 s/   Kimberly Sherman
Kimberly Sherman, OSB 174646

Education, Environmental, & Estate Law Group LLC
P.O. Box 728
Eugene, Oregon, 97440
Tel: (503) 910-6172
kim.sherman@e3lawgroup.com

Attorney for Plaintiff

20 - Complaint