**BEFORE THE OFFICE OF ADMINISTRATIVE HEARINGS**
**STATE OF OREGON**
**for the**
**OREGON DEPARTMENT OF EDUCATION**

| | | |
|---|---|---|
| IN THE MATTER OF:THE EDUCATION OF | ) | **FINAL ORDER** |
| | ) | |
| | ) | OAH Case No. 2020-ABC-04021 |
| **JS AND EUGENE SCHOOL DISTRICT 4J** | ) | Agency Case No. DP 20-120 |

## HISTORY OF THE CASE

On September 8, 2020, Parents filed a request for a due process hearing (Complaint) with the Oregon Department of Education. The parties attempted to resolve the issues prior to hearing and waived a resolution session in writing. On September 23, 2020, the Eugene School District 4J (District) filed a sufficiency challenge. On October 2, 2020, an Order denying the motion in part and granting in part was issued.

On October 9, 2020, Administrative Law Judge (ALJ) Jill Messecar held a prehearing teleconference (PHC) with the parties. Dr. Kimberly Sherman, Attorney at Law, represented the Student and Parents. Joel Hungerford, Attorney at Law, represented the District. A hearing was scheduled for February 8-12, 2021 with a final order scheduled to be issued on April 26, 2021. Student requested and was granted permission to file an amended complaint. On October 21, 2020, Student filed Plaintiff's First Amended Complaint (Amended Complaint). On November 24, 2020, ALJ Messecar convened a second prehearing teleconference with the same parties in attendance. At the conference, the ALJ confirmed the hearing dates. On November 25, 2020, Student filed a Motion to Compel a Specific Response to Student's Request for Due Process Hearing (motion to compel). The District filed a response on December 7, 2020. On December 22, 2020, an order granting the Motion to Compel a Specific Response was issued.

On January 13, 2021, Parents filed a Second Motion to Compel a Specific Response to Student's Request for Due Process Hearing (second motion). On February 8, 2021, the second motion was denied. The District filed a response on January 20, 2021. A third PHC was held on January 20, 2021. The hearing was rescheduled pursuant to a request from both parties. The hearing was scheduled for April 12 through 16, 2021.

ALJ Messecar convened a videoconference hearing as scheduled on April 12, 2021. Dr. Sherman, attorneys-at-law represented Parents and Student. Joel Hungerford, attorney-at-law, represented the District. The hearing concluded on April 15, 2021.

The following individuals appeared and testified on behalf of both parties:
- Dr. Cheryl Linder, Retired Director of Special Education;[1]
- Joyce Smith-Johnson, Principal, the Fox Hollow 4J program during the 2018-

---

[1] Dr. Linder was designated as an expert in administration of special education programs.

**Exhibit 1: page 1 of 32**

2019 school year;[2]
- Leila Schuck, Student Services Administrator during the 2018-2019 school year;[3]
- Elizabeth Johnson, Special Education Consultant for the District;[4] and
- Dr. Karen Apgar, District school psychologist and coordinator of school psychological services.[5]

In addition, the following individuals appeared and testified on behalf of the District;
- Dr. Kat Lange, current Director of Special Education;[6]

In addition, the following individuals appeared and testified on behalf of Student:
- Sarah Snyder, Student's private therapist;[7]
- Torri Wright, owner of BEHCA, LLC and Wright Behavior Consulting;[8]
- Abraham Smith, educational assistant at the Fox Hollow ESD program and the Fox Hollow 4J program;
- Mother;
- Rachel Gibbons, behavior specialist with the Fox Hollow ESD program during the 2017-2018 school year;
- Joyce Evans, District's home instruction special education teacher during the 2018-2019 school year;
- Jennifer Shelton, special education teacher at the Fox Hollow ESD program;
- Father;
- Grandfather;
- Nichole Buchness, The Child Center therapist;

Subsequent to the hearing, the parties submitted written closing arguments on May 24, 2021. The record closed on that date.

Abbreviations used in this order:
AG - Annual Goal
BSP - Behavior Support Plans
FAPE - Free Appropriate Public Education
FBA - Functional Behavioral Assessment
IEP - Individual Education Program
LRE - Least Restrictive Environment
PLAAFP- Present Level of Academic Achievement and Functional Performance
SDI - Specially Designed Instruction

## ISSUES

---

[2] Ms. Smith-Johnson was designated as an expert in administration of special education programs.
[3] Ms. Schuck was designated as an expert in administration of special education programs.
[4] Ms. Johnson was designated as an expert in pre-k to 12 special education instruction.
[5] Dr. Apgar was designated as expert in school psychology.
[6] Dr. Lange was designated as an expert in administration of special education programs.
[7] Ms. Snyder was stipulated as an expert in in clinical social work and implementing interventions in a clinical setting.
[8] Ms. Wright was designated as an expert in designing and conducting FBAs, designing BSPs, designing and implementing behavior intervention strategies, and designing high fidelity data collection methods.

1. Whether the District denied Student FAPE in violation of the Individuals with Disabilities Education Act (IDEA).

2. Whether the District denied Student FAPE under of the Rehabilitation Act of 1973 (Section 504) by acting with deliberate indifference toward his/her need for SDI, services, and accommodations.

## EVIDENTIARY RULING

Exhibits D1 through D90 and D92 through D96, offered by the District, were admitted without objection. The District subsequently withdrew Exhibits D51, D52, and D91.

Exhibits S1 through S8, S10 through S17, S21 through S34, S36 through S43, S45 through S47, S56 through S61, S63 pages 32 through 36, S64, S68 through S97 were admitted without objection. Parents subsequently withdrew S9, S18, S19 all pages except Page 21, S24 through S27, S35, S37, S39, S40, S43, S44, S45, S46, S49 through S52, S54, S55 through S57, S63 pages 1 through 31, S62, S66, S67.

District objected to S19 page 21, 2016 annual IEP placement page on the grounds that it was irrelevant to the placement at issue. That objection was overruled as having some propensity to establish what educational program Student was attending prior to the 2018-2019 school year at issue. S20 the annual April 2017 IEP on the grounds that it was irrelevant to the placement at issue. That objection was overruled for the same reason as S19 page 21. S48 2016 daycare receipts on the grounds that it did not establish what actual child care costs were for the 2018-2019 school year and were not comparable as Student was not placed in a child care setting. The Districts objection was irrelevant because Student was not placed in a child care setting for the 2018-2019 school year. S53 2016 daycare reimbursements on the same grounds as S48 and the objection was upheld for the same reason. S63 pages 32 through 36 Ms. Snyder's therapy invoices while Student was attending The Child Center.

## FINDINGS OF FACT

### Background

1. Student was born on June 16, 2008. Student experienced brain damage from exposure to alcohol and drugs within the first three years of life. Student was then removed from his/her biological mother's care and placed with his/her father and stepmother. Student was subsequently adopted by his stepmother. Parents have engaged Student in a number of therapies over the years and including treatment with a private therapist, Ms. Snyder. (Ex. S2 at 2.)

2. Student was diagnosed with fetal alcohol syndrome and developmental delays in May 2012 and attention deficit hyperactivity disorder in November 2013. (Ex. S4 at 1.)

3. Student has demonstrated an inability to self-regulate or identify emotions and has difficulty with perspectives of others. (Tr. v 2 at 487: 16-24.)

**Exhibit 1: page 3 of 32**

4. Justin Potts, school psychologist for the District, completed a psychoeducational assessment and evaluation of Student in April 2016. (Exs. S2, S3.) Mr. Potts noted that Student's strengths were that he/she was a sweet, gentle, engaged, and loving child who listened to music and helped the family. Teachers noted that Student liked to take things apart and climb, along with seeking sensory stimulation. (Ex. S2 at 2.) Behavioral targets in Student's BSP were to use language to make requests, take breaks, or ask for help and to replace behaviors of yelling and running by earning choice time with peers and helping out around the school. (Ex. S2 at 3.)

5. At an IEP team meeting on April 11, 2016, Student was determined to be eligible for special education services under the categories of emotional disturbance and other health impairment. (Ex. D1 at 2.)

6. Due to increased behavioral needs of students throughout the District, in 2017, the District implemented a new methodology program they called the "behavior framework", which was also referred to as the "progressive discipline methodology." That program improved District-wide systems of consistently recording behaviors in order to gain a better picture of what was going on with students. As part of the progressive discipline methodology, the District used major and minor referral forms to track students' behaviors and what triggered those behaviors. (Tr. v 1 at 30:10-31:3.)

7. In the District, progressive discipline is a philosophy in which educators teach to the behavior of a student. If the behavior does not change, then the District may impose progressively more severe consequences. The nature of the consequences can vary based on the needs of the student and any disability. (Tr. v 1 at 112:8-17.)

8. The District jointly ran the Fox Hollow ESD program at the Fox Hollow campus with the Lane Educational Services District until the end of the summer of 2018. The District did not consider the Fox Hollow ESD program to be a mental health program. However, mental health services were included in the program. (Tr. v 4 at 945:17-19.) When the District ran the Fox Hollow campus program itself after the summer of 2018, the program is referred to as the Fox Hollow 4J program.

### 2017-2018 school year

9. The Fox Hollow ESD program used a wraparound team methodology (WRAP team) which provided an array of services to the students. The WRAP team included teachers, support staff including behavioral support specialists, and parents. (Tr. v 2 at 378: 8-17.) Ms. Snyder and Parents attended WRAP team meetings during the 2017-2018 school year. (Tr. v 2 at 379: 10-113.)

10. The Fox Hollow ESD program employed Susan Remmers as a mental health specialist. Ms. Remmers provided services at the Fox Hollow program from late September 2017 through the end of the 2017-2018 school year. (Tr. v 1 at 103:12-104:3.)

**Exhibit 1: page 4 of 32**

11. During the 2017-2018 school year, Student's teacher, Jennifer Shelton, Ms. Remmers, and a behavioral specialist, Rachel Gibbons worked together as a team for the elementary behavior class Student attended. (Tr. v 4 at 927: 4-117.)

12. Parents believed that the Fox Hollow ESD program was a mental health based program. (Ex. S75 at 2.) Parents were unaware of how often or what exact type of contact Student had with Ms. Remmers. (Tr. v 4 at 893: 17-19.)

13. During September 2017, the Fox Hollow ESD program noted in incident forms that Student was involved in four incidents of inappropriate behavior including inappropriate language, hitting staff or a peer, refusing to follow directions, spitting on staff, and throwing items. Between October 16, 2017 and April 16, 2018, staff noted nine incidents of inappropriate behavior including inappropriate language, hitting and kicking staff or a peer, refusing to follow directions, damaging property, spitting on staff or a peer, and throwing items. (Ex. D38.)

14. During the 2017-2018 school year, the Fox Hollow ESD program communicated with Parents regarding Student's behavior through a notebook that was sent home on a regular basis, weekly emails, and monthly WRAP meetings. (Tr. v 4 at 843: 22- 844: 3.)

**April 2018 IEP**

15. The District held Student's annual IEP meeting on April 6, 2018. (Ex. D7.) During the meeting the IEP team reviewed progress reports, academic scores, and information provided by the Parents. The IEP team discussed Student's proposed goals along with current improvements and a potential future transition to a neighborhood school. (Ex. D10 at 1.)

16. During the April 2018 IEP meeting, the IEP team updated Student's April 7, 2017 BSP. The updated BSP was incorporated into the April 2018 IEP. The BSP identified Student's unique needs in the area of behavior as noncompliance, elopement, along with disruptive, threatening, aggressive or destructive behaviors, and work refusal. (Ex. D8 at 15.)

17. In the area of Social/Emotional/Behavioral goals, the April 2018 IEP contained four goals.
Goal 1 stated that Student would follow a prompt to take a break or indicate that Student needed a break in a noisy environment in at least 8 of 10 observed opportunities. That goal indicated that Student was presently not responding to directions when in a noisy environment and would typically yell loudly, run towards the individual making noise, or act aggressively toward that individual.
Goal 2 stated in situations where Student wanted to get someone's attention  Student would use expected behaviors such as raising a hand, tapping the person's arm or shoulder, or politely requesting the person's attention in at least 8 of 10 observed opportunities. That goal indicated that Student was presently yelling or moving into the personal space of others multiple times per day along with being physically inappropriate with others.

**Exhibit 1: page 5 of 32**

Goal 3 stated that Student would initiate a positive interactions with a peer in 8 of 10 observed opportunities and that Student was doing so with specific adult prompting. Goal 4 stated that Student would ask for choices like alternative activities or the opportunity for a delay or additional support when given a transition warning and that Student would choose between the alternatives offered in 8 of 10 observed opportunities. That goal indicated that Student was responding to warnings with loud verbal protests and physically inappropriate responses like running, climbing on furniture, throwing objects, physically attacking staff, antagonizing peers, or elopement. (Ex. D8 at 9.)

18. Under the heading of Long-Term Behavioral Goals in the April 2018 BSP, the WRAP team listed three suggestions, Student would engage in safe behavior, Student would have the opportunity to move back to a neighborhood school, and the school would reduce the number of calls to Parents concerning Student's negative behavior. The BSP did not indicate why or how reducing phone calls to Parents would help with Student's behavior. (Ex. D8 at 21-22.)

19. The April 2018 BSP included a list of skills to teach Student for each goal. The BSP included strategies to prevent problem behavior from occurring, including providing constant reinforcement of clear expectations, providing structured opportunities to respond appropriately, giving only one instruction at a time, providing positive reinforcement and feedback from adults, maintaining a log of things that make Student happy, and pre-teaching or practicing correct behavior. Additional strategies included supervising Student vigilantly, checking in with Student when Student was expected to wait, and providing Student with a visual volume chart as a reminder. (Ex. D8 at 23-24.)

20. The April 2018 BSP also included strategies to reinforce appropriate behavior, including giving Student bonus points for independent work, saying yes to Student request whenever possible, using behavior contracts to increase Student's level of self-monitoring, not giving attention to Student when Student exhibited non-desired behavior, implementing timeout when Student violated personal space, and clearing the room when Student exhibited unsafe behavior. (Ex. D8 at 24-25.)

21. The April 2018 BSP listed punishment procedures and safety procedures. Punishment procedures indicated that immediately after an episode of inappropriate behavior staff were to tell Student to take some time and verbally debrief with Student afterwards. Safety procedures listed steps to take when Student exhibited dangerous behavior. The safety procedures indicated that the room should be cleared and staff should follow the Mandt System restraint for persons of small stature which involved physically holding Student over certain parts of Student's body to restrain him/her and prevent Student from running away. (Ex. D8 at 25.)

22. The April 2018 IEP stated that regular progress reports would be provided to Parents on June 8, 2018 and February 1, 2019. (Ex. D8 at 8.)

23. The April 2018 IEP placement option chosen was a public separate school 50% or more of the time. The benefits were that Student would receive more intensive individualized

**Exhibit 1: page 6 of 32**

instruction, small group/individualized instruction, and specific behavior monitoring. The placement decision did not mention access to embedded mental health specialists. (Ex. D9.)

24. The April 2018 IEP listed 30 minutes weekly of alterative physical education in a small group as one of the supplementary aids and services. (Ex. D8 at 11.)

25. The District mailed Parents a copy of Student's IEP progress report on June 18, 2018. That progress report noted that on Goal 1 Student had made progress and that the goal would be met by the next IEP review. On Goals 2, 3, and 4 Student was reported to have made progress, that the goal may not be met, and that instructional strategies might need to be changed. The progress report also contained a few comments for each goal regarding Student. (Ex. D34 at 1-2.)

26. Student attended the Fox Hollow ESD program during the 2016-2018 school years and was observed by the WRAP team to make steady progress in academics, social functioning, learning to use coping skills to regulate his/her system. The team also noted that Student was able to follow directions, ask adults for breaks, reduce running behaviors, and to make friends. The team also noted that Student had significantly decreased aggressive/destructive behaviors, and was working towards being a self-manager. If Student continued to make consistent progress, the WRAP team was in the process of considering a step down plan would be started within the following year to provide a very slow transition to a neighborhood school. (Ex. S13.)

27. In the spring of 2018, the WRAP team met on a monthly basis to discuss Student. As part of the meeting, the WRAP team discussed the goals the program had for Student which were frequently focused on Student's behavior at school. The WRAP team discussed Student's successes and needs along with action steps. (Ex S33.)

**2018-2019 school year**

28. The Oregon Department of Education has determined that five hours of one-on-one direct instruction is considered full-time enrollment for purposes of state school funding. (Tr. v 1 at 46:11-12; 144: 7-15.)

29. When the District assumed full responsibility for the Fox Hollow program after the 2017-2018 school year they did not provide an embedded mental health specialist at the campus for the program because the program's emphasis was on behavioral specialists. (Tr. v 1 at 104:25; 115:20-23.) The District had mental health specialists in the District available if there was a need for a student to meet with one. (Tr. v 5 at 1140: 13-22.)

30. Ms. Smith-Johnson was assigned as the interim principal of the Fox Hollow program and student services administrator during the 2018-2019 school year. (Tr. v 1 at 204:11-13.)

31. At the end of August 2018, Father and Ms. Smith-Johnson exchanged emails regarding the upcoming school year. In his emails, Father explained Student's medical history,

**Exhibit 1: page 7 of 32**

behavioral issues, and trauma resulting from Student's experience with a previous special education teacher at the District. Father also explained that Student needed consistency and would have a difficult time with transitioning to so many changes. Ms. Smith-Johnson replied that she had worked with students with significant behavioral needs in the classroom and that the District would use behavioral specialists to observe all the students and to update BSPs. (Ex. D58; Tr. v 4 at 945: 17-19.)

32. While enrolled at the Fox Hollow 4J program Student attended school from 8:25 a.m. to 2:55 p.m. Monday through Thursday and from 8:25 a.m. to 1:40 p.m. on Friday. (Ex. D58 at 2.)

33. On September 13, 2018, Student was evaluated by Dr. Randall Phelps, a pediatrician at the Child Development and Rehabilitation Center. Dr. Phelps noted that Student's parents were mainly concerned that Student seemed to be very angry, grumpy, verbally aggressive, and very negative. Student had learned some information about his/her biological mother that caused distress and anger. Student's grandfather was in the hospital which also caused Student stress. Dr. Phelps outlined the therapy and other steps the family was taking to help Student. Dr. Phelps diagnosed Student with fetal alcohol spectrum disorder, attention-deficit hyperactivity disorder symptoms, anxiety, and a lot of anger and negativity. (Ex. S7.)

34. During the 2018-2019 school year, Student's BSP was placed in a binder in Student's classroom and was available to staff and teachers. (Tr. v 1 at 221:19-25; v 2 at 336: 14-22.)

35. During the fall of 2018, Ms. Smith-Johnson assisted Student's teachers with implementing the BSP by assisting with de-escalation, redirection, and communication with Student. (Ex. D72 at 1; Tr. v 2 at 258: 2-7.)

36. The District implemented the progressive discipline program at the Fox Hollow program at the start of the 2018-2019 school year. (Ex. D73 at 1; Tr. v 1 at 206:22-23.) During the 2018-2019 school year, the staff at the Fox Hollow program filled out major and minor referral forms for students for documentation purposes, but not disciplinary purposes, as part of the District-wide practice. (Ex. S74 at 1; Tr. v at 1 208:3-16.)

37. In September 2018, the District noted one incident of inappropriate behavior which involved Student threatening to harm a teacher. (Exs. D41 at 1.)

38. Between October 5, 2018 and November 16, 2018, the District completed 15 major and two minor referral forms for Student. On those forms, staff documented that Student used inappropriate language six times, touched other students inappropriately four times, and damaged property five times. On those forms, staff also documented that Student hit, slapped, or pinched staff five times and bit a teacher's arm leaving a significant injury one time. On the major referral forms, staff noted Student's motivation for the problem behavior, the District's actions, and a description of the incident and location of the incident, along with the type of violation the staff believed the behavior involved. The

**Exhibit 1: page 8 of 32**

District mailed a copy of each referral form to the Parents and also notified the Parents about each referral via either a telephone call, email, or in person. (Ex. S41.)

39. The District suspended Student for half a day on October 8, 2018 after Student hit Ms. Smith-Johnson in the back and an educational assistant in the shoulder. The District suspended Student for two days on November 15, 2018 after Student bit the teacher's arm, causing a substantial injury, and attempted to stab a staff member with a pen. (Ex. S41 at 1, 16.)

40. Based upon her experience with behaviorally challenged students, Ms. Smith-Johnson believes that it often takes until the end of October each school year for students to get to know each other and the teacher, settle in, and get beyond any issues at the beginning of a school year. (Tr. v 1 at 223: 2-7.)

41. Parents complained about the referrals being sent to them and accused the District of punishing Student for known behavioral issues. In response, Dr. Linder informed Parents that the new documentation did not represent a "direct disciplinary action" as one would see at a traditional school (Ex. D73 at 1.)

42. The Parents made it clear to the District during the start of the 2018-2019 school year that they did not find the referrals to be helpful and were irritated when they received them. (Ex. S74; Tr. v 1 at 212:10.)

43. Between September and October of 2018, at least two substitute teachers and a new teacher working in Student's classroom due to changes in school personnel. (Tr. v 1 at 128: 2-19.)

44. On October 8, 2018, Parents requested that the District hold an IEP team meeting as soon as possible. Parents also stated that they believed that Student's IEP and BSP had not been reviewed by staff or that staff were ignoring it. (Ex. D62.)

45. During the fall of 2018, the staff at the Fox Hollow 4J program were beginning to try different techniques with Student and gathered information on how the new techniques were working. However, they had not determined whether it was necessary to revise Student's BSP. (Tr. v 2 at 258: 21- 259: 6.)

46. During the fall of 2018, Kim Reinhardt, who had worked with Student as a behavioral consultant a few years earlier, and Juan Mesa, a behavioral consultant working at the Fox Hollow 4J program, met regularly to discuss Student's BSP. Mr. Mesa also shared information about Student's BSP with other staff at Fox Hollow. (Tr. Vol. 2 at 337:19-338:21.) Behavioral consultants are licensed special education teachers who have trauma-informed care training. (Tr. v 5 at 1141: 1-6.)

47. During the period at issue, Leila Schuck, a student services administrator was familiar with Student's educational needs and behavioral issues from working with Student on various occasions since 2013. (Tr. v 2 at 327: 12-24.) Through the entire 2018-19 school

**Exhibit 1: page 9 of 32**

year, Ms. Schuck worked with Student upon request from Ms. Smith-Johnson who knew of Ms. Schuck's familiarity with Student and his/her family. Ms. Schuck also worked as a substitute principal when Ms. Smith-Johnson was absent during October 2018. (Tr. v 2 at 328: 11-19; 331: 1-2.)

48. During the fall of 2018, Ms Schuck discussed implementation of Student's BSP with Ms. Smith Johnson and observed that the BSP was being implemented in the classroom. (Tr. v 2 at 338:17-21.)

49. Ms. Snyder has been Student's therapist since early in 2016. As Student's therapist she noticed that Student's inappropriate behavior was more intense and more frequent during the time he/she was at the Fox Hollow 4J program than they had been at the Fox Hollow ESD program. (Ex. S86; Tr. v 2 at 406: 10-13.)

50. Based upon her discussions with the staff and her observations of Student, Ms. Schuck did not believe that Student's behaviors changed significantly between the 2017-18 and 2018-19 school years. (Tr. v 2 at 496:4-8.) Ms. Schuck believed that the challenges that Student was working on during the 2018-19 school year were ones that Student had been working on for some time. (Tr. v 2 at 330: 20- 331: 7.)

51. During the period at issue, Student's grandfather worked with Student as Student's personal service worker and was paid for this work by the Lane County Department of Developmental Disability Services. As a personal service worker, Student's grandfather assisted Student with activities of daily living during non-school hours. (Tr. v 5 at 979:1-21.)

52. After being suspended in October and November 2018, Student indicated that he/she felt depressed, hated themselves, that they should not be in the program, that it was their fault, and that they were stupid. In November Student expressed a desire to die. (Tr. v 4 at 961: 8-21.)

53. By the time of the November 2018 IEP meeting, Parents believed that the Fox Hollow 4J program was not the correct placement for Student due to Student's agitation and dysregulation. Student frequently told his/her parents that it was awful at school. Parents believed the Fox Hollow 4J program was causing trauma to Student. (Tr. v 4 at 909: 23-910: 17.)

## November 2018 IEP

54. Parents, Grandfather, Ms. Smith-Johnson, Ms. Snyder, Dr. Linder, Ms. Schuck and two other District personnel were present for the November 2018 IEP meeting. (Ex. D14 at 1.)

55. The District took notes of the discussion at the November 2018 IEP meeting. The team started the meeting by having everyone discuss Student's strengths. Next, Student's family shared their concerns. The team then reviewed the IEP starting with the goals and

**Exhibit 1: page 10 of 32**

discussed what had been happening with Student since the start of the fall semester. The team discussed Student's need for a trusted adult around him/her and the District's inability to guarantee the same aide or teacher would be with Student every day. The Parents stated that Student did not want to return to the Fox Hollow 4J program and that they were seeking to place Student at The Child Center. The team discussed placement at The Child Center and agreed that a day treatment program was the best option for Student. The District agreed to begin the process of placing Student at The Child Center and told the Parents that The Child Center generally required parents to use insurance to pay for therapists at the program. Mother stated that Student was traumatized each time Student came to school in his/her current classroom. The team then discussed the option of home instruction while they waited for a space at The Child Center to open up. Following that discussion, the District offered Student five hours of home instruction. Mother stated that the maximum amount of time that Student could handle was 90 minutes at a time. The District agreed to work around Student's grandparents' schedules regarding time and day of home instruction. Mother then asked about conducting an FBA. Members of the team stated that not much would be learned from an FBA at that time as Student was starting a new type of instruction. After the discussion, the team agreed that it would not be helpful. The team then discussed the scheduling of Student's triennial educational evaluations. (Ex. D14.)

56. During the November 2018 IEP meeting, the team discussed Student's social emotional needs and changed Student's accommodations to address those needs by adding curriculum. (Tr. v 1 at 38:15-18.) Parents asked for the District to pay for child care during the time that Student was not receiving home instruction. The District declined to pay for child care although the District had previously paid for child care for Student during first grade when he/she had last participated in home instruction. (Tr. v 1 at 49:8-16; 51:9-16.) The District had paid for day care during Student's first grade because they utilized the day care setting to perform some observations and evaluations that they needed to have conducted. (Tr. v 1 at 193:5-17.)

57. During the November 2018 IEP meeting, the team discussed accommodations and agreed to add physical activity to Student's accommodations. (Ex. D12 at 2.) The November 2018 IEP listed the same 30 minutes weekly of alterative physical education in a small group as one of the supplementary aids and services that was contained in the April 2018 IEP. (Ex. D12 at 11.) The District issued a prior written notice after the meeting that indicated that the team added regularly scheduled physical activity to Student's accommodations listed on the service summary of the IEP. (Ex. D16 at 1.)

58. The District felt that Parents did not believe that any changes made to Student's IEP would be sufficient to meet Student's needs at the Fox Hollow campus. (Tr. v 1 at 39:13-15.)

59. The District rarely used interim placements for students but they did so for short periods of time when it was necessary. (Tr. v 1 at 41:2-14.)

60. The April 2018 BSP was attached to the November 2018 Amended IEP and contained no

**Exhibit 1: page 11 of 32**

changes. (D12 at 15-26.)

61. The PLDFPs did not change from the April 2018 IEP to the November 2018 IEP. (Exs. D8; D12.)

62. Even though the IEP team changed Student's placement to home instruction, the team did not change the SDI minutes from the amounts stated in the April 2018 IEP. (Ex. D12 at 11-12.)

63. The District was unable to promise that a specific aide or teacher would be preset for any student for a variety of reasons including the need for those individuals to be absent for illness, vacation, or other leave. (Tr. v 1 at 183:7-15.)

64. Shortly after the meeting, Ms. Smith- Johnson emailed District staff asking them to move Student to home instruction as she was working to schedule Student with a home instruction teacher, Joyce Evans. (Ex. D78.)

### 65. Home Instruction

66. Joyce Evans worked as Student's home instruction special education teacher from the end of November 2018 to the end of the 2018-2019 school year. (Tr. v 4 at 775:6-18.)  Ms. Evans worked in special education for 15 years in Florida where she worked with students with behavior and emotional disorders. She subsequently provided home instruction to students in Oregon for approximately five to six years. (Tr. v 4 at 774: 8-14.)

67. Ms. Evans reviewed Student's case file, including Student's IEP and BSP before she started working with Student. (Tr. v 4 at 775: 19-25.)

68. Elizabeth Johnson began working for the District as a special education consultant in 2018. Ms. Johnson consulted with Ms. Evans to plan Student's instruction on goals and intervention programs. (Tr. v 3 at 521: 8- 522: 21.)

69. Ms. Evans had determined from her experience that when working with students one-on-one during home instruction it was best for her to determine a student's strengths, weaknesses and major gaps at the start of her work with any student. Once Ms. Evans determined the areas Student actually needed the most help with to meet his/her IEP goals, she worked on helping Student to figure out how to meet those goals. (Tr. v 4 at 778:8-14.)

70. When Student got upset by the sight of the academic materials he/she had been using in class at Fox Hollow, Ms. Evans worked with Student on his/her deficits using other similar materials she had access to. (Tr. v 4 at 780:10-25; 789:11-790:6.)

71. During home instruction, Ms. Evans worked with Student on math, writing, handwriting, social studies, and health. (Tr. v 4 at 781:5-16.) Ms. Schuck discussed Student's needs

**Exhibit 1: page 12 of 32**

with Ms. Evans and helped her tailor the curriculum. (Tr. v 5 at 1137:19-25.)

72. During home instruction, Ms. Evans also worked on Student's social/emotional/behavioral goals. Ms. Evans worked with Student on the goal of using expected behavior to gain the attention of others through listening to his/her self-talk, modeling, and role playing. (Tr. v 4 at 799:8-10.)

73. Parents emailed the District on November 26, 2018 that they believed that home instruction was meeting Student's academic needs but that Student's social and emotional needs were not being met. (Ex. D83 at 1.)

74. The District scheduled an IEP team meeting on December 17, 2018 to discuss Parents concerns. (Exs. D18; D84 at 1.)

75. Father believed that between December 2018 and June 2019, Student's self-esteem made a gradual upward progression when Student was able to build rapport with Ms. Evans and began to feel safe in a learning environment. (Tr. v 5 at 1064: 16-25.)

76. Student did not miss any extracurricular activities that other children participated in while on home instruction. (Tr. v 3 at 579: 2-8.)

### 77. December 17, 2018 IEP

78. During the December 2018 IEP meeting, the IEP team discussed the need for Student to have more peer interaction and physical activity. Due to those needs, the District agreed to pay for a program that the family selected. (Tr. v 1 at 62:10-14.) The December 2018 IEP listed five minutes of daily physical activity during home instruction as one of the supplementary aids and services. (Ex. D17 at 11.) The District issued a prior written notice after the meeting that indicated that the IEP team agreed that the family would locate an outside recreational activity that Student would do as a physical outlet with same- aged peers for socialization. The District agreed to compensate the family for the program. (Ex. D16 at 1.) The IEP team also discussed how SDI in social behavioral skills was being implemented and the curriculum that was being used. The team also discussed adding a physical education class for Student and possibly increasing Student's hours of instruction as Parents requested. After discussing the issue, the team decided to increase Student's hours of instruction from five hours to six hours a week. (Ex. D18.)

79. During the IEP meeting, the team removed transportation from Student's IEP. After discussion, the IEP team agreed to add the "Super Flex" curriculum which used super heroes to teach specific behavioral skills to the other curriculum Ms. Evans was using. (Ex. D18.) Student's social emotional curriculum was changed to one called Super Flex because Student was struggling with skills around interacting with peers, being able to appropriately gain adult attention, and similar issues. (Tr. v 1 at 60:9-12.)

80. During the December 2018 IEP meeting, the IEP team also planned the triennial reevaluation of Student for special education services. This reevaluation was scheduled to

include a file review, achievement assessments, behavioral assessments, direct observations, and sensory processing measurements. Mother signed a consent at the IEP meeting for the District to perform the reevaluation. (Ex. D19.)

81. During the December 2018 IEP meeting, no one on the team proposed any alternative placement to the interim home instruction set forth in the December 2018 IEP. (Tr. v 1 at 62:5.)

82. The April 2018 BSP was attached to the December 2018 Amended IEP and contained no changes. (D17 at 15-26.)

83. In January 2019, Parents selected a recreational gymnastics program for Student to attend. (Ex. D87.) The District paid for the gymnastics class. (Tr. v 1 at 141: 4-8.)

84. The District mailed Parents a copy of Student's IEP progress report on February 1, 2019. That progress report noted that on Goals 1, 2, and 4 Student was reported to have made progress, but that the goals may not be met, and that instructional strategies might need to be changed. Student was noted to not have worked on goal 3 due to being on home instruction. The progress report also contained a few comments regarding Student for each goal. (Ex. D35.)

85. The reevaluation reports were presented at the annual IEP team meeting held on March 19, 2019. (Ex. D20.)

**86. March 2019 IEP**

87. On March 19, 2019, the IEP team met to draft Student's annual IEP and to address Student's continued eligibility. (Ex. D20.)

88. Karen Apgar (a District school psychologist) and Ms. Johnson completed the reevaluation. Ms. Johnson and Mr. Mesa observed Student at his/her gymnastics class and a religious class in February 2019. The reevaluation report noted that Student continued to qualify for special education under the category of emotional disturbance. The report also noted that Student had an ability to learn which was significantly hampered in a school-based learning environment by emotional regulation challenges. The report noted that when Student was observed in community activities with peers that Student was able to politely converse and take turns but did not actively engage with peers during unstructured time. Student was noted to demonstrate an extremely high number of depressive behaviors and that he/she often felt sick or ill when attending school. (Ex. D21 at 13-14.)

89. In the area of Social/Emotional/Behavioral goals, the March 2019 IEP contained three goals.
Goal 1 stated that when Student was given a task Student would begin the task "within three or four seconds" and complete the entire assignment before the end of the instruction period. The IEP indicated that Student was presently negotiating with

**Exhibit 1: page 14 of 32**

instructors and completing 17 percent of math assignments and 58 percent of other assignments.

Goal 2 stated that when soliciting attention Student would use several word phrases to gain the person's attention. The IEP indicated that this was a new goal and that Student was not performing the goal yet.

Goal 3 indicated that Student was "able [to appropriately] express frustration in the home setting most of the time but has not exhibited this in past school settings." The goal stated that Student would use several word phrases to express his/her frustration or disappointment in order to more effectively communicate "most of the time or four out of five moments of supposed emotional distress." (Ex. D24 at 7.)

90. The March 19, 2019 IEP SDI summary reflected a reduction in service time to reflect the fact that Student received six hours of home instruction per week. SDI in Behavioral/Social Skills was reduced from 300 minutes per week in the previous annual IEP to 60 minutes per week; (Exs. D8 at 10; D24 at 10.)

91. The March 2019 IEP listed five minutes of daily physical activity during home instruction as one of the supplementary aids and services. (Ex. D24 at 10.)

92. The IEP team remained in consensus that Student should continue to receive home instruction while they waited for a spot to open up at a day treatment center. (Tr. v 1 at 242: 19- 243: 8.)

93. On the placement page of the March 2019 IEP document the Parents wrote that they authorized the goals and services but did "not agree that the interim placement of tutoring for 2 hours, 3 days a week of tutoring provided FAPE." The Parents also wrote that Student had been denied a full day of education since November 16, 2018, and that they were responsible for providing supervision of Student for the remaining hours of the school day. (Ex. S23 at 13.)

94. Ms. Johnson saw a progression of Student's skills while Student was on home instruction that was not linear but ebbed and flowed as it usually did with other students. (Tr. v 3 at 529: 14-19.)

95. The District mailed Parents a copy of Student's IEP progress report on June 19, 2019. That progress report noted that on Goals 1, 2, and 3 Student was reported to have made progress, but that the goals may not be met, and that instructional strategies might need to be changed. The progress report also contained a few comments regarding Student for each goal. (Ex. D36)

### The Child Center

96. Ms. Schuck is the District administrator that oversees the District's interactions with day treatment facilities. (Tr. v 2 at 353: 16-18.)

97. The District does not operate The Child Center and cannot compel that school to accept a

District student. (Tr. v 1 at 43:11.) Once a District student is placed at The Child Center, the District pays for the educational costs of the academic components of classroom instruction. Therapeutic costs such as counselors and therapists are billed to that student's families' insurance. (Tr. v 1 at 180:19-25.)

98. Student began attending classes at The Child Center on July 25, 2019. (Tr. v 5 at 1116: 23-24.) During the first 30 days at The Child Center, Student did not exhibit any unsafe behaviors and was not restrained. (Tr. v 5 at 1120: 14-16.)

99. The Child Center provides mental health services as part of its day treatment program. The Child Center's policy is to bill each parent insurance for those services whenever possible. The Child Center bill school districts as a last resort if the parents insurance refuses to pay. (Ex. S85.)

100.    The Child Center focused its mental health services on helping Student address his/her traumatic school experiences as well as teaching Student the skills needed to be successful in the classroom. (Ex. S86.)

101.    Student's family continued therapy with Ms. Snyder (for both Student and the family) while Student was attending The Child Center because Ms. Snyder had been Student's therapist for many years, starting prior to  Student  starting school. Ms. Snyder is a constant and consistent person in Student's life and the Parents believed that with all the educational changes within the year and a half having a consistent therapist was very important for continuity of care. (Tr. v 4 at 873: 6-15.)

## CONCLUSIONS OF LAW

1. Whether the District denied Student FAPE in violation of the Individuals with Disabilities Education Act (IDEA).

2. Whether the District denied Student FAPE under of the Rehabilitation Act of 1973 (Section 504) by acting with deliberate indifference toward his/her need for SDI, services, and accommodations.

## OPINION

### Burden of Persuasion

The burden of persuasion in an administrative hearing challenging an IEP is properly placed upon the party seeking relief. *Schaffer v. Weast*, 126 S Ct 528 (2005). In their closing brief, Parents asserted that "For allegations of procedural violations in the Ninth Circuit, the local education agency has the burden of proof on showing whether it met the procedural requirements of the IDEA." Parents cite *M.C. v. Antelope Valley Union High Sch. Dist.*, 852 F.3d 840, 851 (9th Cir. 2017) in support of their assertion. However, Parents assertion is overbroad. In *Antelope Valley,* the Court found that because the mother of a student with a disability was deprived of knowledge of the services that were being offered to the student, it was impossible for the

mother to assess the substantive reasonableness of those services. *Id.* The Court held that in those circumstances, "the burden shifts to the school district to show that the services the student actually received were substantively reasonable." *Id.* But those are not the circumstances present in this case. Parents have not alleged, nor does the evidence demonstrate, that the District deprived Parents of the services provided to Student. Therefore, there is no legal basis for departing from the normal burden of persuasion which, in this case, remains with Parents.

The standard of persuasion applicable to an administrative hearing is preponderance of the evidence. *Cook v. Employment Div.* 47 Or App 437 (1980) (in the absence of legislation specifying a different standard, the standard of proof in an administrative hearing is preponderance of the evidence). Proof by a preponderance of the evidence means that the fact finder is persuaded that the facts asserted are more likely true than not true. *Riley Hill General Contractors v. Tandy Corp.,* 303 Or 390 (1989).

### Federal and state requirements for use of funds under IDEA

Student was eligible to receive special education and related services under the IDEA. Parents allege that District failed, under the specific allegations set out below, to meet its legal obligation to provide special education and related services as required under IDEA to Student.

States may access federal funding to provide education to children with disabilities, but the states must provide that education in accordance with federal law. *See* 20 U.S.C. §1411 *et. seq.* States receiving funds must have in effect certain policies and procedures. *See* 20 U.S.C. §1412 *et seq.* To receive these funds, a state must provide that a "free and appropriate education is available to all children with disabilities[.]" 20 U.S.C §1412(a)(1)(A).

Congress, in amending IDEA in 2004 stated the following:

The purposes of this chapter are—
(1)
(A) to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living;
(B) to ensure that the rights of children with disabilities and parents of such children are protected [.]

(20 U.S.C. § 1400(d).)

The Supreme Court set out what was required to provide a "free appropriate public education" in the seminal case of *Board of Educ. Of Hendrick Hudson School District v. Rowley*, (1982). Under *Rowley*, a school district has the duty first to comply with the procedural requirements of the IDEA and second, to develop an IEP that is reasonably calculated to enable Student to receive educational benefits. *Rowley*, at 207, 208. However, the Ninth Circuit has held that "only those "* * * procedural inadequacies that result in the loss of educational opportunity * * * or seriously infringe on the parent[s]' opportunity to participate in the IEP formulation

**Exhibit 1: page 17 of 32**

process * * * clearly result in the denial of FAPE."  *W.G. v. Bd. Of Trustees of Target Range School D.* 960 F2d 1479, 1484 (9ᵗʰ Cir 1992).

Regarding the "appropriate" aspect of FAPE, a school district must "be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances."  *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1002 (2017).

Pursuant to the requirements of the IDEA, under 34 U.S.C. part 300 *et. seq*., the United States Department of Education promulgated rules for state use of funds used to carry out the provisions of the Act. OAR chapter 581 division 015, promulgated under ORS chapter 343 mirrors, for the most part, the requirements set out in the federal rules. The majority of the opinion below cites to the relevant OAR as the implementing rule for Oregon with which school districts are required to comply.[9]

Following identification and evaluation requirements, the cornerstone for educating a student under IDEA occurs through developing a procedurally and substantively sufficient IEP which provides an offer of FAPE. IDEA requires that "at the beginning of the school year, each local educational agency * * * shall have in effect, for each child with a disability in the agency's jurisdiction, an individualized education program[.]" 20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. §300.323(a). OAR 581-015-2220 mirrors the federal requirement, requiring that:

> (1) General:
> (a)  At the beginning of each school year, a school district must have in effect an IEP for each child with a disability within the district's jurisdiction.
> (b) School districts must provide special education and related services to a child with a disability in accordance with an IEP.

In relevant parts, OAR 581-018-2200 provides that:

> (1) The individualized education program (IEP) must include:
> (a) A statement of the child's present levels of academic achievement and functional performance, including how the child's disability affects the child's involvement and progress in the general education curriculum.
> (b) A statement of measurable annual goals, including academic and functional goals (and, for children with disabilities who take alternate assessments aligned to alternate achievement standards, a description of short-term objectives) designed to:
> (A) Meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and
> (B) Meet each of the child's other educational needs that result from the child's disability.
> (c) A description of how the child's progress toward meeting the annual goals will be measured and when periodic reports on the progress the child is making toward

---

[9] Where more appropriate for purposes of clarity, the federal rule may be cited initially, accompanied by the implementing state rule(s).

**Exhibit 1: page 18 of 32**

meeting the annual goals (such as through the use of quarterly or other periodic reports, concurrent with the issuance of report cards) will be provided;

(d) A statement of the specific special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child:

(A) To advance appropriately toward attaining the annual goals;

(B) To be involved and progress in the general education curriculum and to participate in extracurricular and other nonacademic activities; and

(C) To be educated and participate with other children with disabilities and children without disabilities,

(e) The projected dates for initiation of services and modifications and the anticipated frequency, amount, location and duration of the services and modifications described in subsection (1)(d) of this rule.

(f) An explanation of the extent, if any, to which the child will not participate with children without disabilities in the regular class and activities described in subsection (1)(d) of this rule[.]

The IEP team is also directed to develop, review, and revise a student's IEP in consideration of the special factors set out in OAR 581-015-2205. OAR 581-015-2205, entitled "IEP Team Considerations and Special Factors[,]" requires that:

(1) In developing, reviewing and revising the child's IEP, the IEP team must consider:

(a) The strengths of the child;

(b) The concerns of the parents for enhancing the education of their child;

(c) The results of the initial or most recent evaluation of the child; and

(d) The academic, developmental, and functional needs of the child.

(2) In developing, reviewing and revising the child's IEP, the IEP team must consider the following special factors:

(a) The communication needs of the child; and

(b) Whether the child needs assistive technology devices and services.

(3) In developing, reviewing and revising the IEP of children described below, the IEP team must consider the following additional special factors:

(a) For a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies to address that behavior;

* * * * *

(4) If, in considering these special factors, the IEP team determines that a child needs a particular device or service (including an intervention, accommodation, or other program modification) for the child to receive free appropriate public education, the IEP team must include a statement to that effect in the child's IEP.

A failure to implement an IEP will constitute a violation of a student's right to a FAPE only if the failure was material. There is no statutory requirement that a district perfectly adhere

**Exhibit 1: page 19 of 32**

to an IEP, and, therefore, minor implementation failures will not be deemed a denial of FAPE. A material failure to implement an IEP occurs when the services a school district provides to a disabled student falls significantly short of the services required by the IEP. *Van Duyn, et al. v. Baker School District 5J* (9th Cir. 2007) 481 F.3d 770. A party challenging the implementation of an IEP must show more than a minor failure to implement all elements of that IEP, and instead, must demonstrate that the school district failed to implement substantial and significant provisions of the IEP. (*Id.*) However, the materiality test is not a requirement that prejudice must be shown. "[T]he materiality standard does not require that the child suffer demonstrable educational harm in order to prevail." *Id.* at 822.

Regarding procedural violations, minor errors by the school district will not amount to a denial of FAPE if they do not result in a loss of educational opportunity, interfere with the parent's ability to participate in the IEP process, or result in a deprivation of educational benefit. *Doug C. v. Haw. Dept. of Educ.*, 720 F.3d 1038, 1043 (9th Cir. 2013.) Furthermore, the IDEA does not and cannot guarantee any particular educational outcome. *Endrew F.*, 137 S. Ct. at 992 (2017).

Parent's allegations are addressed individually in the sections below.

1. **Whether the District denied Student FAPE in violation of the Individuals with Disabilities Education Act (IDEA).**

    a. **Whether the District failed to implement Student's IEP resulting in a denial of FAPE, during the 2018-2019 school year.**

Under the IDEA, the District was responsible for ensuring that Student, as a child with a disability, was educated with children who were not disabled to the extent possible, and that removal from the regular educational environment occurred only if the nature or severity of Student's disability was such that education in the general education classroom with the use of supplementary aids and services could not be achieved satisfactorily. It is not enough for the District to merely include a provision for supplementary aids and services in the IEP. District personnel must also implement the IEP by using those supports to assist Student in accessing his/her education.

In their Amended Complaint, Parents asserted that the District failed to implement supports necessary for Student to continue to be educated at a school with peers which led to Student being educated without peers while on home instruction. As stated above, the Ninth Circuit Court of Appeals addressed the standard for determining when a school district's failure to implement one or more portions of a disabled child's IEP amounts to a denial of FAPE in *Van Duyn*. In that case, the Court held that a material failure to implement "occurs when the services a school provides to a disabled child fall significantly short of the services required by the child's IEP. Minor discrepancies between the services provided and the service called for by the IEP do not give rise to an IDEA violation." *Id.* at 780.

For the analysis, it is helpful to address the two different timeframes of implementation separately. The two distinct periods of implementation during the 2018-2019 school year

**Exhibit 1: page 20 of 32**

included the period of time when Student attended  the Fox Hollow 4J program and the subsequent period of time when Student receive home instruction.

**Implementation at the Fox Hollow 4j program**.

In their Amended Complaint, Parents asserted that the District's implementation of the progressive discipline methodology during the 2018-2019 school year contradicted Student's BSP which resulted in a failure to implement Student's BSP during the first three months of the school year.

In this case, the District's actual implementation of the progressive discipline methodology regarding Student's behavior did not contradict Student's BSP. There is no disagreement about whether the District implemented the progressive discipline methodology during the 2018-2019 school year. Instead the conflict is about the application of the progressive discipline methodology at the Fox Hollow 4J program to Student's behavior and BSP. There is nothing in Student's BSP that prohibits District staff from documenting behavioral incidents. The evidence conclusively established that staff at the Fox Hollow ESD program documented Student's behavior on incident forms and shared them with Parents at the monthly WRAP meetings. In addition, nothing in Student's BSP prohibited District staff from suspending Student if he/she physically injured someone.

It is clear that Student had increasing difficulty settling into a changed school environment with different teachers at the Fox Hollow 4J program. During the fall of 2018 Student demonstrated many of the problematic behaviors identified in Student's IEP. Multiple District personnel testified that they were implementing the BSP when problematic incidents occurred.

Parents asserted that Student was punished for known behaviors that resulted from Student's diagnosed conditions. The testimony of District witnesses and the documentation from the referrals do not support that conclusion. The evidence taken as a whole establishes that in the 2018-2019 school year, staff were documenting incidents along with Student's motivations in those incidents. While Student was disciplined differently in the 2017-2018 school year than in the 2018-2019 school year, the Parents did not establish that the discipline in the 2018-2019 school year was administered in a progressively punitive manner.

Student was suspended twice in the 2018-2019 school year when he had not been suspended the year before. These suspensions were, as Parents assert, a form of punishment, despite the staff testimony to the contrary. Student's suspensions amounted to punishment for inappropriate behavior because no instructional services were provided and there is no evidence that Student's educational program or behavioral services changed after these suspension. However, from the contemporaneous referral forms, both suspensions relate to the seriousness of Student's injurious behavior and does not appear to be a cumulative or progressive punishment based upon the number of incidents that Student had been involved in.

Parents also asserted that the District failed to implement Student's BSP when they were contacted each time Student's behavior was documented in a referral. However, Parental

**Exhibit 1: page 21 of 32**

notification was not a service that the District was providing to the Student. The suggestion in the BSP that Parents not receive phone calls about Student's negative behavior did not implicate the services that Student was receiving from the District under the IEP.

The evidence established that District applied the methodology to Student in a way that was nondiscriminatory and consistent with Student's BSP. Parents have not established that the District's use of the progressive discipline methodology at the Fox Hollow 4J program constituted a material failure to implement Student's IEP. *See e.g., Garmany v. District of Columbia*, 61 IDELR 15 (SEA DC 2013) (students with disabilities generally are not immune from normal school disciplinary rules, provided the rules are administered in a nondiscriminatory manner and are not inconsistent with the student's IEP.)

**Implementation at home instruction**.

In their Amended Complaint, Parents asserted that while Student was on home instruction the District failed to implement Student's SDI for social, emotional, and behavioral goals in the school environment. Parents allege that by failing to implement Student's SDI in those goals in the school environment, the District failed to implement SDI in an environment that allowed Student to learn.

The 9th Circuit Court of Appeals addressed a similar issue in an unpublished decision which is instructive. In *C.L. v. Lucia Mar Unified Sch. Dist.*, 67 IDELR 136 (9th Cir. 2016, unpublished), the Court examined a school district's implementation of services in a student's behavior plan while that student was on home instruction. The Court held that the school district did not deny a student FAPE when it failed to provide school-based behavioral services during the time that the student received instruction in the home. The Court reasoned that there had been no evidence establishing that the school district had an obligation to provide behavioral services in the home setting which were designed to be implemented in the school setting. Similarly, there was no evidence that the District in this case had an obligation to provide services designed to be implemented in the school setting during home instruction which Parents agreed to while waiting for a spot for Student to open up at The Child Center. The deprivation of school-based services was a result of the agreed upon temporary change while waiting for Student to be able to attend The Child Center.

> **b. Whether the District denied Student FAPE during the 2018-2019 school year when it failed to provide a non-progressive disciplinary methodology or an appropriate disciplinary procedure at the Fox Hollow 4J program.**

In their Amended Complaint, Parents asserted that the District's implementation of the progressive discipline methodology directly contradicted Student's BSP which led to Student displaying significant behavioral challenges while at the Fox Hollow 4J program. As discussed above, the District's implementation of the progressive discipline methodology did not contradict Student's BSP. Because the manner that the progressive discipline methodology was implemented at the Fox Hollow 4J program did not violate Student's BSP, Parent failed to establish that the District denied FAPE in this manner. In an IDEA case the issue is whether the District offered an IEP that was reasonably calculated to allow the student to make progress in

**Exhibit 1: page 22 of 32**

light of student's circumstances. So long as that standard is met, it is not necessary for a District to provide services that parents believe will provide greater benefits.

**c. Whether the District failed to provide FAPE when it provided Student with a five then six hours of home instruction instead of the (6.25 – 7) full school day Student received at 4J Fox Hollow.**

In their closing brief, Parents asserted that the District provided inadequate hours of instruction because it failed to deliver all of the SDI minutes required by the IEPs at issue while Student was receiving home instruction. This argument fails because this claim was not raised by Parents in the Amended Complaint. Parents also asserted that Student's hours of home instruction were inadequate because The Child Center offered a full day school schedule for the full year. This argument also fails because this claim was not raised by Parents in the Amended Complaint.

The issue raised in the Amended Complaint (and clarified in a discussion regarding claims during the final day of hearing) is whether the District was required to provide Student with the same full day of school while Student was on home instruction that Student had received while attending the Fox Hollow 4J program.

In this case, Student was provided with five hours of weekly one-on-one tutoring from a certified special education teacher after the IEP meeting on November 16, 2018 through December 17, 2018 and then six hours per week from December 18, 2018 through the end of the 2018-2019 school year. While the record is not clear with regard to the exact number of hours of instruction that Student received while at the Fox Hollow 4J program, it is undisputed that it was more than six hours a week. The IDEA does not require that students receive the same number of hours of instruction via a one-on-one special education teacher that they would receive when receiving instruction in a group setting. *See, Renton Sch. Dist.*, 111 LRP 72136 (SEA WA 11/10/11) (ALJ found that the IDEA does not require a student to be provided with the same amount of instruction during homebound instruction that the student had been receiving while attending school.)

**d. Whether the District failed to provide a LRE while Student was at the 4J Fox Hollow and then at The Child Center.**

OAR 581-015-2250(1) provides in relevant part:
(1) The educational placement of a child with a disability:
(a) Is determined by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options;
(b) Is made in conformity with the Least Restrictive Environment (LRE) provisions of OAR 581-015-2240 to 581-015-2255.
* * * * *.

OAR 581-015-2240 provides:
School districts must ensure that:

**Exhibit 1: page 23 of 32**

(1) To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled; and

(2) Special classes, separate schooling or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

The 9th Circuit Court of Appeals has held that a change in location does not necessarily equate to a change in placement. *See e.g. Rachel H. v. Haw. Dep't of Educ., 868 F.3d 1085, 1090 (9th Cir. 2017) (*defining "location")*; N.D. v. Haw. Dep't of Educ., 600 F.3d 1104, 1115–16 (9th Cir. 2010) (*defining "educational placement" and outlining when a change in "educational placement" occurs.)*

**The Fox Hollow 4J program.**

In their Amended Complaint, Parents asserted that Student's placement at the Fox Hollow 4J program was not the LRE for Student. Specifically, Parents asserted that the use of the progressive discipline methodology harmed Student and thus an educational program with a mental health methodology was LRE for Student during the fall of 2018.

Oregon uses the "snapshot rule", which holds that an ALJ must judge an IEP based on the information that was reasonably available to the IEP team at the time the IEP was created, not in hindsight. *Adams v. Oregon*, 195 F.3d.1141, 1149 (9th Cir. 1999.) Thus, Student's placement at the Fox Hollow 4J program in September 2018 must be evaluated based on the information available in April 2018 when the IEP team determined that the LRE for Student was the Fox Hollow ESD program. Over the summer of 2018, the Fox Hollow ESD program ceased to exist and was no longer available as a placement. Instead, the District assumed responsibility for the Fox Hollow program beginning with the 2018-2019 school year.

In the fall of 2018, the District continued Student's placement at the Fox Hollow campus. The Fox Hollow 4J program was different from the Fox Hollow ESD program in one significant respect. Unlike the program operated by the ESD, the Fox Hollow 4J program did not have a mental health specialist available on campus. Instead, the program focused on access to behavioral support specialists. However, that difference in personnel does not appear to have been considered a change in placement by the District for good reason. The IEP does not include mental health services as a service to be provided to Student. In addition, Student was expected to begin transitioning to a neighborhood school over the next year, which would undoubtedly not contain embedded mental health specialists. In addition, Student had continued to exhibit inappropriate behaviors during the 2017-2018 school year and the April 2018 IEP provided goals and a BSP to help Student work on changing that behavior in order to make that transition. The substance of Student's program at the time Student started to attend the Fox Hollow 4J program was equivalent to the substance of the program required by the written BSP.

Based upon the documents provided at hearing, there was no indication in Student's April 2018 IEP that embedded mental health support was a critical factor to Student's continued

**Exhibit 1: page 24 of 32**

success especially in light of Student's expected return to a neighborhood school. While Student would undoubtedly have benefited from closer access to a mental health specialist at the Fox Hollow 4J program, that service could have been provided even if a mental health specialist was not embedded in the program. Nor was there any indication in the April 2018 IEP that the progressive discipline methodology as applied at the Fox Hollow 4J program would be contraindicated. This record supports the conclusion that the Fox Hollow 4J program offered Student LRE at time Student was placed in that educational program.

**The Child Center.**

In their Amended Complaint, Parents asserted that home instruction was not the LRE for Student because at the time all of the members of the IEP team agreed that The Child Center was the LRE. Parents' argument presupposes that the District had some control over Student's placement at The Child Center. It is not reasonable to fault the District for placing Student on home instruction, as agreed by Parents, after Parents were informed that it could take six to twelve months for an opening to be available at The Child Center.

While home instruction would not be an appropriate setting for students whose needs can be met in a less restrictive placement, there was no evidence presented that a less restrictive setting was available that met Student's unique needs between November 2018 and the end of the school year. At the November 2018 IEP meeting, Parents insisted that Student was traumatized by his/her attendance at the Fox Hollow 4J program. Based upon Student's negative association with the Fox Hollow 4J program and the District's inability to guarantee that Student would have access to a single aide or teacher at any school setting, a temporary placement on home instruction where Student was instructed by a special education teacher on the IEP goals was LRE.

### e. Whether the District denied Student FAPE during the 2018-2019 school year when it failed to conduct a new FBA.

Parents asserted that the District denied Student FAPE when it failed to conduct a new FBA. In the Amended Complaint, Parents allege that the District should have conducted an FBA in September 2018 when Student's behaviors became significantly more challenging than they were at the end of the prior school year.

The purpose of an FBA is to isolate a target behavior and develop a hypothesis regarding the function of the target behavior. A target behavior is one that interferes with a student's ability to progress in the curriculum and to achieve the student's IEP goals. Once a target behavior is identified and the hypothesis developed, a positive behavior intervention plan can be prepared to address the target behavior with strategies and interventions, if necessary, or the target behavior can be addressed using a more informal approach. *Broward County Sch. Bd.*, 110 LRP 38160 (SEA FL 05/07/10).

The IDEA does not impose any specific time requirement for how often an FBA must be completed. *See*, OAR 581-015-2181 (A school district must conduct a functional behavioral assessment and develop, review or revise a behavior intervention plan within 45 school days of

**Exhibit 1: page 25 of 32**

receiving parental consent.) While an FBA may help the IEP team address behavioral issues, the IEP team is not required to conduct an FBA to address all behavioral concerns. 71 Fed. Reg. 46,683 (2006). In this case, the District had completed a psychoeducational assessment and evaluation in April 2016. In addition, Student's BSP had been updated on April 17, 2018 prior to the beginning of the 2018-2019 school year.

At the beginning of the 2018-2019 school year, the evidence establishes that the District anticipated behavioral issues from students who (like Student) exhibited emotional and behavioral difficulties at the start of the school year. The District had Student's April 2018 BSP to guide their reactions to Student's behavior and had received information via email from Father that Student did not do well with change and transitions. The District took steps to bring an educator familiar with Student's needs to the Fox Hollow 4j program. During the fall of 2018, District staff were applying techniques from the BSP and were considering new techniques. Based upon Student's unique needs and known responses to new people and situations, the District did not deny Student FAPE when it failed to conduct a new FBA.

    **f. Whether the District denied Student FAPE during the 2018-2019 school year when it failed to provide skilled wraparound behavioral support in an educational setting with an opportunity to interact with same aged peers while Student was on home instruction.**

In their Amended Complaint, Parents asserted that the District failed to provide behavioral supports listed in Student's IEP during home instruction. As noted above, the District was not required to provide behavioral supports during home instruction that were designed to be utilized in a school setting. *C.L. v. Lucia Mar Unified Sch. Dist.*, 67 IDELR 136 (9th Cir. 2016, unpublished). This reasoning also applies to this issue. The Parents agreed to home instruction while Student waited for an opening at the Child Center. Given that Student was to be educated in the home, the District could not have provided school-based behavioral supports or the opportunity to interact with peers.

    **g. Whether the District denied Student FAPE during the 2018-2019 school year when it failed to Amend Student's PLDFP on the November 2018 amended IEP.**

In their Amended Complaint, Parents asserted that in violation of 34 C.F.R. 300.320(a)(3) "the "present levels" description written with each goal in the November 2018 IEP amendment is an exact copy from the April 2018 IEP and provide no information to Parents regarding Student's progress toward [Student's] IEP Goals." The IDEA section cited by Parents requires a description of a student's progress towards meeting their annual goals, how the progress would be measured, and when reports of the progress would be provided to parents.

School districts are required to periodically update the present levels and those updates should be contained in the current IEP. The failure to update those present levels may deny the parent an opportunity to participate in the IEP process. *See e.g., Bucks County Montessori Charter Sch.*, 75 IDELR 289 (SEA PA 2019)(holding that the failure to update the statement of

**Exhibit 1: page 26 of 32**

present levels may create an inadequate IEP and deny parents an opportunity to participate in the IEP process.)

There was no argument or evidence that the annual IEP created on April 6, 2018 failed to describe Student's progress towards annual goals or that the IEP failed to list the timeframes of the reports of Student's progress would be provided. Instead Parents argue that the annual IEP amended in November 2018 was required to provide updated present levels of progress because Parents were unable to determine what progress, if any, Student was making toward Student's goals. In this case, the District provided Parents with an abundance of information about Student's progress or lack thereof on meeting his/her annual goals. In fact, much of Parents complaint appears to focus on the overabundance of information about Student's inappropriate behaviors shared by the District with the Parents. That information was provided in the 17 referrals that Parents received through emails, phone calls, and regular mail. The District also provided Parents with Student's June 2018 progress report.

Parents cited no legal authority that required Student's PLDFP to be updated on more than an annual basis. While there are many cases which address both the need for present levels and the need for accurate information regarding a student's progress towards meeting IEP goals, the evidence in this case establishes that the District did so through behavioral referrals and progress reports. *See e.g., Ravenswood City Sch. Dist. v. J.S.*, 59 IDELR 77 (N.D. Cal. 2012) (holding that the district's complete failure to include the present levels in the IEP made the IEP fundamentally useless.)

### h. Whether the District denied Student FAPE when it failed to make up missed instructional time when Student was suspended from the 4J Fox Hollow program.

In their Amended Complaint, Parents asserted that Student was denied instructional time due to the District's implementation of the progressive discipline methodology which resulted in Student's suspension, and other missed instructional time. In their closing brief, Parents cite no legal authority that requires a District to provide instructional time for situations where a student misses less than 10 days of instructional time due to discipline.

OAR 581-015-2405 states, in part,
(1) School districts may remove a child with a disability who violates a code of student conduct from the child's current educational placement to an appropriate interim alternative educational setting, another setting, or suspension, for up to ten school days in a school year to the same extent, and with the same notice, as for children without disabilities. These removals are not considered a change in placement.
(2) During disciplinary removals described in section (1) of this rule:
(a) School districts are not required to provide access to special education and the general curriculum unless students without disabilities are provided access during this time.

**Exhibit 1: page 27 of 32**

In their closing brief, Parents asserted that Student missed six days of instruction. Even if that amount is accurate, under the above rule the District was not required to provide instruction for Student for time that was missed due to disciplinary issues.

i. **Whether the District denied Student FAPE during the 2018-2019 school year when it failed to provide physical education and a variety of educational opportunities available to nondisabled peers.**

In their Amended Complaint, Parent asserted that the District failed to provide Student with the variety of programs available to nondisabled children such as art, music and vocational education while Student was participating in home instruction. The Amended Complaint alleged that the District was therefore in violation of 34 C.F.R. § 300.108 and 34 C.F.R. § 300.110. Those IDEA rules require that districts provide a variety of educational programs and services along with physical education services.

This is a unique situation because Student was attending home instruction and was not denied these programs as a part of Student's special education program in a school setting. 34 C.F.R. § 300.108 requires that if a student needs specially designed physical education that it must be described in the child's IEP and that the district must provide those services directly or make arrangements for those services to be provided through public or private programs. Student's November 2018 IEP listed specially designed physical education as one of the services provided by the District. However, there was no evidence that physical education services were provided at the start of home instruction. Parents have established that the District failed to implement the special physical education portion of Student's IEP for a portion of time.

The IEP team met again approximately a month after Student was first placed on home instruction. During that December 17, 2018 IEP meeting, the IEP team specifically discussed Student's physical education needs and the team agreed that the family together would pick out a physical education program. The Parents agreed to do so and the District agreed to pay for the program. The Parents then sent the District an email a month later stating that they had found a gymnastics class that Student liked and would be attending. The District paid for that class. In total it appears that Student missed about two months of physical education and one of those months was due to the time it took for the family to find a physical education program for Student. Overall, taking into consideration that the District failed to provide special physical education to Student for approximately one month, which included the Thanksgiving and Veterans Day breaks, it was not a major failure to implement.

34 C.F.R. § 300.110 requires that districts provide disabled student a variety of educational programs and services that are available to non-disabled children. At hearing, Dr. Lange testified that Student did not miss any extracurricular activities. There was no other evidence presented regarding exactly which extracurricular activities Student missed that other non-disabled children in the District had participated in. Without evidence of exactly what activities Student missed, an ALJ is unable to find that any failure on the District's part was a material failure to implement and thus a violation of FAPE.

**Exhibit 1: page 28 of 32**

**j.  Whether the District failed to provide Student's education in a free manner to Student's parents and grandparents when it failed to provide pay for adult supervision during the non- instructional school hours while Student was on home instruction.**

In their Amended Complaint, Parents asserted that the District was required to pay for adult supervision for Student during the hours that Student was not receiving home instruction. Parent cited no legal authority that requires a District to provide adult supervision for students who are educated at home.

Because the District previously paid for Student's child care when Student was temporarily on home instruction in first grade, it is understandable that the Parents would seek reimbursement for the hours that Student's grandparents cared for Student during school hours. However, Parents cited no legal authority that requires a District to continue to reimburse parents simply because they have done so in the past.

In *Daniel O. v. Missouri State Bd. of Educ.*, 30 IDELR 588 (W.D. Mo. 1999), the district court held that the element of "free" in FAPE requires that instruction and support services be provided at public expense. The 8th Circuit affirmed the district court decision. *Daniel O. v. Missouri State Bd. of Educ.*, 210 F.3d 378 (8th Cir. 2000 unpublished.) In addition, a 2011 decision issued by an ALJ in the State of Washington addressed precisely this issue. In that case, the parents argued that they should not have to pay an adult to stay with the student nor jeopardize their own employment to remain at home while their child was on home instruction. *Renton* at 72136 (SEA WA 2011). In the *Renton* case, the ALJ held that while it was unfortunate that the financial burden was placed on the family, the IDEA did not provide the family with relief. Both *Daniel O* and *Renton* support the District's position that the District is not obligated to pay for child care costs for Student incurred while on home instruction in the 2018-2019 school year.

In summary, the documentary evidence as well as the testimony presented during hearing show that Student had a very difficult time adjusting to the new the Fox Hollow 4J program and exhibited increasingly frequent and intense negative behaviors. District staff attempted to ameliorate those behaviors by employing the supports from the BSP but Student did not appear to be responding as hoped. The IEP team as a whole determined that Student needed to be placed at a day treatment program. Student has apparently done well once he started attending The Child Center. Included in the Parent's vision of their child's education was that their child would be provided what they believed were elemental parts that had helped their child in the past. But the fact that those things do not occur does not necessitate the conclusion that a school district failed to provide a FAPE to a student. Upon careful consideration of all of the evidence presented, the record did not establish that the District violated the IDEA in the ways alleged by Parent.

**2.  Whether the District denied Student FAPE and discriminated against Student under Section 504 by acting with deliberate indifference.**

**Exhibit 1: page 29 of 32**

In their Amended Complaint, Parents asserted that the District violated Section 504 by acting with deliberate indifference when it failed to provide a full day of instruction while Student was on home instruction, the same educational program that the Fox Hollow ESD program had provided, pay for child care, immediately place Student at a day treatment program in November 2018, and pay for the mental health therapist that The Child Center provided.

To prevail on a Section 504 claim, a party must show that the school district acted "intentionally or with deliberate indifference." *Mark H. v. Lemahieu*, 513 F3d 922, 938 (9th Cir. 2008); *Duvall v. County of Kitsap*, 260 F3d 1124, 1139 (9th Cir 2001). Deliberate indifference requires both knowledge that harm to a federally protected rights is substantially likely, and failure to act upon that likelihood. *City of Canton v. Harris*, 489 US 378, 389 (1988) (deliberate indifference requires some form of notice and the opportunity to conform to statutory dictates). Simply establishing a denial of FAPE under the IDEA is not sufficient to prevail in a Section 504 claim. *Mark H. v Hamamoto*, 620 F3d 1090, 1096 (9th Cir. 2010); *see also Sellers v. School Board*, 141 F3d 524, 529 (4th Cir. 1998) (something more than a mere failure to provide a FAPE must be shown, either bad faith or gross misjudgment must be shown to support a Section 504 claim).

At hearing, the District staff who worked with Student testified consistently that they were aware of the BSP and worked to implement the described supports in the fall of 2018. While the record is clear that Student's inappropriate behavior did not diminish in November 2018 leading up to the IEP meeting, there was no evidence that it was due to gross misjudgment or bad faith on the part of the educators. It is extremely unfortunate that the supports listed in the BSP did not work to help Student manage his/her behavior in the fall of 2018 but on this record it appears to be due to a confluence of Student's difficulty with changing teachers, the lack of embedded mental health support, and Student working through issues regarding his birth mother. With the benefit of hindsight, it is possible to surmise that the removal of mental health specialists from the Fox Hollow program contributed to Student's intensifying inappropriate behavior. However the evidence did not establish that the District removed these specialists in bad faith or with indifference to Student's needs. Ms. Schuck, who had worked with Student on and off since 2013, testified that she believed that Student's behaviors in the fall of 2018 were similar to what the District had experienced in the prior school year. The incident reports from the 2018-2019 school year and 2018-2019 school year support the assertion that Student displayed similar types of behavior.

The evidence in this case simply does not show that the District failed to act when Student acted inappropriately. While it is clear that in hindsight, the District's actions were inadequate, there is no evidence that the inadequacy was intentional nor done with deliberate indifference towards Student's needs as a disabled person.

In summary, it is clear from the documentary evidence as well as the testimony presented during the hearing that Student needed to have consistent and trusted educators providing his/her instructional program. Student performed well when the District provided that during home instruction even if mental health services were not also provided. Upon careful consideration of all of the evidence presented, the record did not establish that the District violated the IDEA and Section 504 in the ways alleged by the Parents. Parents' request for relief is denied.

**Exhibit 1: page 30 of 32**

## ORDER

Parents failed to show that District violated its obligation to provide Student with a FAPE with regard to all claims. Parents failed to show that District violated Section 504 with regard to all claims.

Parents' Amended Complaint filed October 21, 2020 is therefore **DISMISSED** with prejudice.

Jill Marie Messecar
_____
Administrative Law Judge
Office of Administrative Hearings

## APPEAL PROCEDURE

**NOTICE TO ALL PARTIES**: If you are dissatisfied with this Order you may, within 90 days after the mailing date on this Order, commence a nonjury civil action in any state court of competent jurisdiction, ORS 343.175, or in the United States District Court, 20 U.S.C. § 1415(i)(2). Failure to request review within the time allowed will result in **LOSS OF YOUR RIGHT TO APPEAL FROM THIS ORDER.**

**ENTERED** at Salem, Oregon this 1st day of July, 2021, with copies mailed to:

Jan Burgoyne, Oregon Department of Education, Public Services Building, 255 Capitol Street NE, Salem, OR 97310-0203.

**Exhibit 1: page 31 of 32**

## CERTIFICATE OF MAILING

On July 1, 2021 I mailed the foregoing FINAL ORDER in OAH Case No. 2020-ABC-04021 to the following parties.

### BY: CERTIFIED MAIL:

Parent(s) of Student
755 Nottingham Ave
Eugene  OR  97404

Kim  Sherman, Attorney at Law
Education Environmental and Estate Law Group LLC
PO Box 728
Eugene  OR  97440

Cydney Vandercar, Superintendent
Eugene School District 4J
200 N Monroe St
Eugene  OR  97402

Rich Cohn-Lee, Attorney at Law
The Hungerford Law Firm LLP
PO Box 3010
Oregon City  OR  97045

Joel Hungerford, Attorney at Law
The Hungerford Law Firm, L.L.P.
PO Box 3010
Oregon City  OR  97045

### BY ELECTRONIC MAIL:

Mike Franklin, Legal Specialist
Department of Education
255 Capitol Street NE
Salem, OR  97310-0203


  Anesia N Valihov
Hearing Coordinator
Office of Administrative Hearings

**Exhibit 1: page 32 of 32**